IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YALMI SHIHEED,                          *

    Plaintiff,                        *

        v.                             *            Civil Action No. DKC-22-720

JAMES SMITH, *et al.*,
                              *
    Defendants.

                        ***

**MEMORANDUM OPINION**

Self-represented Plaintiff Yalmi Shiheed, an inmate presently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983 against the Maryland Department of Public Safety and Correctional Services ("DPSCS"), the Warden of Western Correctional Institution ("WCI"), the WCI Assistant Warden, the WCI Chief of Security, Lt. James Smith, Sgt. James Bennett, Correctional Officer II ("COII") David Hedrick, COII Bradley Baumgardner, COII Dakota Welsh, COII Ronald Barnes, Cory Walker, Melanie Gordon, Lt. Jeff McFarland, COII Michael Rounds, and COII William Rubio[1] (collectively, "the Correctional Defendants"); as well as Amy Stafford-Schroyer[2] and William Raynor, III (collectively, the "Medical Defendants").  ECF No. 1.  In the complaint, Plaintiff alleges that in violation of the Eighth Amendment to the United States Constitution, the Correctional Defendants subjected them[3] to excessive force and failed to protect

---

[1] When the case was instituted, Defendant Rubio was erroneously listed as "M. Rubin." Having identified Rubio as the proper Defendant, M. Rubin will be dismissed from this suit.  *See* ECF No. 51 (noting appearance of counsel of behalf of William Rubio).

[2] Amy Stafford-Schroyer was originally identified as Amy Booth.  *See* ECF No. 1 at 1.

[3] According to medical records submitted to the court, Plaintiff identifies as non-binary and uses "they/them" pronouns.  *See* ECF No. 20-3 at 8.

them from being attacked by another inmate, and the Medical Defendants were deliberately indifferent to their serious medical condition.  *Id.* at 3.  ECF No. 4.  Plaintiff seeks injunctive relief and monetary damages.  *Id.* at 13.

The Medical Defendants and Correctional Defendants filed respective motions to dismiss or, in the alternative, for summary judgment.  ECF Nos. 20, 54.  The court informed Plaintiff, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to the motions could result in the dismissal of the complaint.  ECF Nos. 21, 55.  Plaintiff subsequently filed correspondence, which the court construes as a response.  ECF No. 56.

Having reviewed the submitted materials, the court finds that no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons set forth below, the Medical Defendants' motion, construed as one for summary judgment, will be granted.  As to the Correctional Defendants, Plaintiff's failure to protect claim will be dismissed without prejudice for failure to exhaust administrative remedies; the claims against DPSCS, the Warden, Assistant Warden, and Chief of Security shall be dismissed; and the Correctional Defendants' dispositive motion will be denied with regard to Plaintiff's excessive force claims against Officers Bennett, Hedrick, Baumgardner, Welsh, and Barnes.  The five remaining Defendants will be directed to answer Plaintiff's complaint.

## BACKGROUND

### A.      Plaintiff's Allegations

Plaintiff's claims stem from three incidents that took place at WCI.  Verified Compl., ECF No. 1.  First, Plaintiff states that on June 16, 2019, they informed Lt. McFarland, COII Rounds, and another correctional officer that they were in fear for their life.  *Id.* at 4.  Plaintiff, who states they are intersex, asked to be transferred to a different cell, and their requests were repeatedly

denied for three weeks. *Id.* On July 7, 2019, Plaintiff was stabbed by another inmate for refusing sexual activity. *Id.* According to Plaintiff, their assailant was someone they had "no dealings with." *Id.* Nonetheless, Plaintiff faults the Correctional Defendants for refusing to move them to a different housing tier despite being intersex and therefore at risk of harm. *Id.*

The next incident alleged in Plaintiff's complaint took place on July 17, 2019. *Id.* at 5. At approximately 12:20 p.m. on that day, COII Rubio brought an alleged gang member to be housed with Plaintiff, although Plaintiff had informed Defendants Bennett, Smith, and Walker that he was not a compatible cellmate. *Id.* Plaintiff stepped out of the cell, claiming that they did not feel safe with that inmate. *Id.*

Subsequently, Plaintiff was taken to another area to be strip-searched but refused to take off their clothes because they had authorization to be searched only by a female officer. *Id.* In response, Sgt. Bennett ordered COII Hedrick and COII Baumgardner forcefully to remove Plaintiff from the strip cage although Plaintiff was handcuffed. *Id.* COII Hedrick grabbed Plaintiff's neck and smashed their face onto the side of the cage while COII Baumgardner ordered Plaintiff to lift their legs. *Id.* The officers then yanked off Plaintiff's clothes and touched Plaintiff inappropriately. *Id.* at 5-6. Specifically, Sgt. Bennett grabbed Plaintiff's testicles, another officer grabbed their breasts, and COII Hedrick put his thumb in Plaintiff's anus and his fingers in their perineum, all while verbally abusing Plaintiff. *Id.* at 6.

Plaintiff was then dragged on the floor by their legs until the officers reached an area with camera surveillance. *Id.* They placed Plaintiff, who was now wearing thermals, in a cell with no bunk, sheets, or blankets, and took away their lunch. *Id.* While uncuffing Plaintiff, COII Hedrick yanked the handcuffs, causing bruises to Plaintiff's wrist and causing their shoulder to pop out of

place.  *Id.*  After popping their shoulder back in, Plaintiff removed the thermals, used them as a pillow, and tried to go to sleep.  *Id.*

At around 1 p.m., Sgt. Bennett woke Plaintiff up and asked them to approach.  *Id.* at 6.  As Plaintiff began to stand up and put their thermals on, Sgt. Bennett sprayed mace on their face.  *Id.* at 7.  Plaintiff screamed and backed away while Sgt. Bennett continued to spray mace.  *Id.*  When Plaintiff turned around, Sgt. Bennett sprayed their anal cavity, then handcuffed and escorted them back to the strip cage with no thermal bottoms.  *Id.*  Several officers laughed at Plaintiff and doused them in the face with hot water from a coffee pot.  *Id.*  Plaintiff remained in the strip cage for about 45 minutes while being maced repeatedly, "made fun of, laughed at," "cursed out and slandered." *Id.*  Thereafter, Plaintiff was taken to Nurse Stafford-Schroyer for a "mock medical exam," where she only checked their pulse, told them "it's not that bad," and to "stop yacking everywhere."  *Id.*

Correctional officers took pictures of Plaintiff before taking Plaintiff to the showers.  *Id.* at 7-8.  According to Plaintiff, the water, which was regulated by correctional staff, was too hot, and they were not given soap.  *Id.* at 8.  Officers then refused to give Plaintiff a new set of clothes and left them naked for 30 minutes.  *Id.*  Later, Plaintiff was given a smock and transported to Special Observation Housing ("SOH"), based on a fabricated story that Plaintiff tried to drown themselves in a toilet.  *Id.*  Plaintiff was placed in a cell with only a sink and a toilet.  *Id.*

The third incident giving rise to Plaintiff's claims took place on July 22, 2019.  *Id.*  At approximately 12:30 p.m., Plaintiff informed psychiatric staff that they wanted to harm themselves to escape torture at the hands of others.  *Id.*  Plaintiff tied a jumpsuit to the door with one end around their neck.  *Id.*  After Sgt. Bennett was notified, COII Welsh reported to Plaintiff's cell and sprayed them with mace.  *Id.* at 8-9.  Although Plaintiff was beginning to remove the jumpsuit from their neck, COII Welsh continued to point the spray nozzle in Plaintiff's face.  *Id.* at 9.

4

Plaintiff began to panic and attempted to block the slot but was struck in their genitals with the can. *Id.* Eventually, another officer joined COII Welsh in spraying Plaintiff. *Id.* COII Welsh ran out of mace, but COII Barnes and COII Baumgardner continued to deploy the spray. *Id.* at 9-10.

When the spraying stopped, Plaintiff reported to the cell door and asked to be handcuffed for transport. *Id.* at 10. Plaintiff was taken to the strip cage and threatened to be sprayed with mace again unless they took off their clothes. *Id.* Plaintiff did as instructed and was doused in the face with hot water. *Id.* Meanwhile, COII Welsh continued to spray Plaintiff with mace while verbally abusing them. *Id.* COII Welsh finally stopped after being twice told by a Sergeant to do so. *Id.*

Plaintiff remained in the strip cage for about 45 minutes before they were given clothes. *Id.* They were then taken to the medical unit to be "fake examined by RN W. Raynor," who only checked Plaintiff's pulse. *Id.* at 11. Plaintiff was taken to a hot shower but was given no soap or washcloth. *Id.* Thereafter, Plaintiff was seen by Defendant Gordon, a therapist, for crisis intervention. *Id.* Plaintiff informed her that they would rather kill themselves than endure the treatment at WCI. *Id.* Subsequently, Plaintiff was returned to SOH with no socks, shoes, or pants. *Id.*

In support of their complaint, Plaintiff submitted exhibits indicating that they submitted three requests for administrative remedy ("ARP") regarding the claims raised here. ECF No. 1-1. In the first ARP, dated July 31, 2019, Plaintiff mentioned the stabbing on July 7, 2019, and requested a new housing assignment. *Id.* at 1-4. That ARP was dismissed for procedural reasons on August 1, 2019, with instructions to resubmit by August 16, 2019, and to include a statement indicating whether "there is an issue with your current cell partner." *Id.* at 1. It is unclear whether Plaintiff resubmitted the ARP.

In the second ARP, also dated July 31, 2019, Plaintiff detailed their allegations stemming from July 17, 2022, and demanded financial compensation, transfer to another facility, and for correctional officers to be reprimanded or terminated from employment. *Id.* at 5-10. That ARP was dismissed for procedural reasons on August 1, 2019, because an Intelligence and Investigative Division ("IID") investigation was ongoing. *Id.* at 5.

Plaintiff's third ARP, dated August 9, 2019, involved the incident on July 22, 2019, and requested the same relief listed in the previous ARPs. *Id.* at 11-16. Like the second ARP, the third ARP was dismissed for procedural reasons on August 12, 2019, because an IID investigation was ongoing. *Id.* at 11.

In their response to the Defendants' motions, Plaintiff summarily alleges that they "did exhaust all [their] remedies including the IGO [Inmate Grievance Office]," but Plaintiff "never heard back from IGO." ECF No. 56 at 3.

### B.   Medical Defendants' Response

Amy Stafford-Schroyer, a registered nurse at WCI, states that Plaintiff was transferred to WCI on April 4, 2019, with chronic medical problems including epilepsy, asthma, gender identity disorder, hyperlipidemia, and chronic rhinitis, as well as behavioral and mental issues such as bipolar disorder and suicidal ideations. Decl. of Stafford-Schroyer, ECF No. 20-2 (citing Medical Records, ECF No. 20-3). On July 7, 2019, Plaintiff was stabbed in the chest by another inmate and was sent to the hospital for evaluation and treatment. ECF No. 20-3 at 12.

On July 17, 2019 at 1:38 p.m., Stafford-Schroyer saw Plaintiff for pepper spray exposure. *Id.* at 17. At that time, Plaintiff's pulse was 107, respirations were 24, blood pressure was 138/94, and oxygen saturation was at 98 percent. *Id.* Stafford-Schroyer observed mucous and phlegm present from Plaintiff's nose and mouth but saw no visible trauma. *Id.* In addition, Stafford-

Schroyer noted that Plaintiff's sutures from the prior stab wound remained intact. *Id.* According to Stafford-Schroyer, Plaintiff was clothed when she saw them, as officers would not let an inmate present naked to medical staff. ECF No. 20-2 at ¶8.

Stafford-Schroyer denies Plaintiff's allegation that she performed a "mock" exam. *Id.* at ¶9. Rather, she performed a normal post-pepper spray examination and ensured that Plaintiff was in no acute or respiratory distress. *Id.* Stafford-Schroyer saw no indication that hot water had been thrown on Plaintiff's face, and nothing about Plaintiff's vital signs was concerning to her from a medical perspective. *Id.*

Raynor, a registered nurse who worked at WCI at the time of the underlying incidents, states that Plaintiff was placed into suicide monitoring on July 17, 2019, and saw therapist Melanie Gordon on the following day. Decl. of Raynor, ECF No. 20-4 at ¶8 (citing ECF No. 20-3 at 19, 22). Gordon noted that on July 17, Plaintiff had refused housing and was moved to a contingency cell. *Id.* Plaintiff smeared feces, covered themselves with a mattress, and was disruptive. *Id.* By the time Gordon arrived, officers had used force due to Plaintiff "putting [their] head in the toilet," causing self-harm, and refusing to follow a direct order to stop. *Id.* Gordon noted that Plaintiff had concerns regarding housing, security, and custody. *Id.* She also noted that Plaintiff was a transgender inmate who has been using "gender identity to attempt to manipulate for housing." *Id.*

On July 22, 2019, Plaintiff saw Gordon at 10:10 a.m. for individual therapy. *Id.* at 26. Plaintiff stated they were doing well and had no problems throughout the weekend but voiced concern about their housing assignment due to a recent assault by another inmate. *Id.* Gordon indicated she would check on Plaintiff later in the week. *Id.*

Later that day, Nurse Monica Wilt was conducting mental health weekly segregation rounds when she saw Plaintiff being loud and aggressive, and looking disheveled. *Id.* at 34.

Plaintiff threatened to smear feces all over the cell, and Wilt told them that she would return after segregation rounds were completed. *Id.* at 35. While being escorted down the stairs, Wilt saw that Plaintiff had a jumper around their neck and was demanding to be removed from the cell. *Id.* Wilt asked her escorting officer to call for support in order to remove Plaintiff to safety. *Id.*

At 1:40 p.m., Raynor was called to see Plaintiff for pepper spray exposure. *Id.* at 30. Contrary to Plaintiff's allegation that Raynor only took their pulse, Raynor recorded all of Plaintiff's vitals. *Id.* Although handcuffed, Plaintiff was able to get onto the table in the medical room without assistance and was alert and oriented with clear speech. *Id.* Plaintiff denied any injuries and shortness of breath, nor did Raynor observe such. *Id.* Because Plaintiff stated that they felt they may harm themselves, Raynor contacted Gordon for possible follow up. *Id.*

At 3:06 p.m., Plaintiff saw LPN Lori Keister, who noted that Plaintiff was able to shower and get most of the pepper spray off their body and eyes. *Id.* at 32. During that visit, Plaintiff showed no signs or symptoms of distress. *Id.* Later, at 10:35 p.m., Plaintiff saw LPN Michelle Foy, who noted that Plaintiff had no medical complaints. *Id.* at 38.

### C.   Correctional Defendants' Response

The Correctional Defendants do not dispute that Plaintiff was stabbed on July 7, 2019. During that time, Plaintiff and their assailant were assigned to Housing Unit 5 but in different cells. *See* Incident Report, ECF No. 54-12. At approximately 7:45 p.m., correctional staff observed the two inmates in the rec hall, exchanging closed fist punches to each other's face and torso. *Id.* at 2. The inmates did not comply with initial orders to stop fighting and separate, but following staff use of pepper spray and additional orders to stop, they complied. *Id.*

Medical examination revealed that both inmates had injuries, and Plaintiff was transported to Western Maryland Regional Medical Center for advanced care and treatment. *Id.* Following

an investigation of the incident, Plaintiff refused to give a statement and signed a Complaint Withdrawal form. *Id.* at 3-4. After returning from the hospital, Plaintiff was placed in an isolation cell by themselves, until they were transferred to Housing Unit 4, B wing, cell 32 on July 9, 2019. Inmate Traffic History, ECF No. 54-7 at 4. Consistent with Plaintiff's statement that they had no prior dealings with their assailant, ECF No. 1 at 4, Correctional Defendants aver that Plaintiff did not inform Lt. McFarland or COII Rounds that their assailant had been threatening them or that the two inmates had any problems with each another. Decl. of McFarland, ECF No. 54-9 at 2-3; Decl. of Rounds, ECF No. 54-10 at 2.

On July 11, 2019, Plaintiff was moved to Housing Unit 4, A wing, cell 33. ECF No. 54-7 at 4. According to the Correctional Defendants, Housing Unit 4 at WCI contains Administrative Segregation, which is where inmates are placed when administrative reasons exist for their removal from general population. Decl. of Smith, ECF No. 43-13 at ¶6.

At approximately 12:20 p.m. on July 17, 2019, COII Rubio placed Plaintiff in hand restraints so that their cellmate could be returned to cell 4A-33. Inmate Rule Violation, ECF No. 54-17 at 1. When the cell door was opened, Plaintiff stepped out of the cell and indicated they were not going back in the cell, stating that "he wasn't living with anybody." *Id.* COII Rubio informed Plaintiff that failure to comply with a housing assignment would result in an adjustment for misconduct. *Id.* When Plaintiff still refused to reenter the cell, COII Rubio gave them a direct order to do so, which they refused. *Id.* Thus, Plaintiff was given an adjustment, their status was changed to Administrative Segregation Pending Adjustment, and they were moved directly to Holding Cell 4B-1 by COII Hedrick. *Id.*; *see also* ECF No. 54-19 at 1. A strip search was not conducted because Plaintiff was moved within the same housing unit, was not suspected of having

contraband, and there was otherwise no basis to conduct a strip search of them at that time.   Decl. of Hedrick, ECF No. 54-18 at 2.

Shortly after 1:00 p.m., Sgt. Bennett and Officer V. Lark went to holding cell 4B-1 to conduct a wellness check due to reports of a strong odor of feces originating from that cell.   Use of Force Report, ECF No. 54-14 at 1.   Upon arriving, Sgt. Bennett noticed a large amount of feces smeared around the cell window.   *Id.*   Sgt. Bennett looked inside and noticed that Plaintiff had their head in the toilet as if they were trying to drown themselves.   *Id.*   Sgt. Bennett ordered Plaintiff to remove their head from the toilet, but they refused to comply.   *Id.*   In an attempt to get Plaintiff to comply, Sgt. Bennett applied a quick burst of pepper spray to Plaintiff's body, which caused them to look at Sgt. Bennett.   *Id.*   Sgt. Bennett then gave Plaintiff another direct order to get up from the toilet, but Plaintiff again refused.   *Id.*   While Plaintiff was looking at him, Sgt. Bennett immediately administered another quick burst of pepper spray to Plaintiff's face.   *Id.*   As a result, Plaintiff stood up, approached the cell door, and complied with Sgt. Bennett's orders.   *Id.*

Correctional staff removed Plaintiff from the cell, and Sgt. Bennett and Officer Lark escorted Plaintiff off the tier to await the arrival of medical staff.   *Id.*   Nurse Stafford-Schroyer arrived and treated Plaintiff for exposure to pepper spray.   *Id.*   Plaintiff was offered but declined to provide a statement regarding the incident.   *Id.*   They were also offered a decontamination shower, which they accepted.   *Id.*   Photographs of Plaintiff wearing a tank top and shorts during the medical evaluation, as well as pictures of the feces in their cell, were provided with the Use of Force Report.   ECF No. 54-19.

After consultation with staff in the psychology department, correctional staff escorted Plaintiff to the SOH unit, where their erratic behavior could be more closely monitored.   *Id.*; *see*

*also* Decl. of Gordon, ECF No. 54-23.  Gordon spoke briefly with Plaintiff, and they expressed concern about their housing assignment.  *Id.* at ¶6.

Gordon met with Plaintiff again on July 18, 2019.  *Id.* at ¶7.  At that time, Plaintiff denied that their gesture of placing their head in the toilet was suicidal or carried out for self-harm.  *Id.* Rather, Plaintiff stated that their sole concern was housing and, "If they were going to be a dick, so was I."  *Id.*  At no time did Plaintiff inform Gordon that they had been improperly strip searched and physically assaulted.  *Id.* at ¶8.

At approximately 12:30 p.m. on July 22, 2019, COII Welsh was making rounds in Housing Unit #4, B Wing when he saw Plaintiff standing at their cell door with an orange segregation jumpsuit tied around their neck and the other end attached to the top of the interior cell door.  Use of Force Report, ECF No. 54-26.  COII Welsh immediately ordered Plaintiff to remove the jumpsuit, but they refused to comply.  *Id.*  COII Welsh then opened the pass through slot and again ordered Plaintiff to remove the jumpsuit from their neck, but they refused.  *Id.*  Next, COII Welsh administered a quick burst of pepper spray to Plaintiff's face to get them to comply, but Plaintiff did not do so and instead tried to grab the fogger from COII Welsh's hands.  *Id.*  After another burst of pepper spray, Plaintiff retreated to the back of the cell, gathered fresh air from the rear window, and attempted to tie one end of the jumpsuit to the window, while the other end was still attached to their neck.  *Id.*  COII Welsh called for assistance and applied a third burst of pepper spray.  *Id.*  Following the arrival of COII Barnes and COII Baumgardner, Plaintiff complied with their orders and removed the jumpsuit from their neck.  *Id.*  Plaintiff was then removed from the cell and escorted off B Wing to await arrival of medical staff.  *Id.*  After being evaluated by Nurse Raynor, Plaintiff was taken to the showers for decontamination.  Use of Force Report, ECF No.54-15 at 1.

Following the shower, Gordon interviewed Plaintiff.  *Id.*  Given Plaintiff's conduct, Gordon instructed staff to keep Plaintiff in SOH for a few more days.  ECF No. 54-24 at 11. According to Gordon, Plaintiff's behavior "was viewed as a manipulative attempt due to his housing status" and discontent with being in a contingency cell.  *Id.*

On August 13, 2019, Plaintiff was issued a Search Exception Identifier Card, which requires that searches of their person must be conducted by female staff.  ECF No. 54-31.  The Correctional Defendants aver that at no time prior to August 13, 2019, was Plaintiff issued such a card.  Decl. of Keisha McGeady, LCSW-C, ECF No. 54-30 at ¶6.

Lastly, the Correctional Defendants state that Plaintiff has submitted only one grievance to the IGO, and it was filed on May 19, 2019, prior to any of the incidents alleged in the instant complaint.  Decl. of Todd Taylor, IGO Director, ECF No. 54-32 at ¶5.  According to the Director of the IGO, Plaintiff has not filed any grievances pertaining to the events alleged to have occurred between July 7, 2019, and July 22, 2019.  *Id.* at ¶6.

## STANDARDS OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

When the moving party styles its motion as a motion to dismiss or, in the alternative, motion for summary judgment, as is the case here, and attaches additional materials to the motion,

the nonmoving party is, of course, aware that materials outside the pleadings are before the court, and the court can treat the motion as one for summary judgment. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## DISCUSSION

The Medical Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff fails to state a claim for deliberate indifference to a serious medical need or, alternatively, entry of judgment in their favor pursuant to Rule 56, based on Plaintiff's failure to

show that they were deliberately indifferent.   ECF No. 20-1.   Likewise, the Correctional

Defendants have moved to dismiss the complaint or for summary judgment in their favor, arguing

that: (1) Plaintiff failed to exhaust their administrative remedies; (2) the Correctional Defendants

are immune from suit for claims against them in their official capacity; (3) the State of Maryland

is not an entity subject to suit under § 1983; (4) Plaintiff fails to allege personal involvement by

the Warden, Assistant Warden, and Chief of Security; (5) Plaintiff fails to establish an excessive

force claim; (6) Plaintiff fails to state a claim of failure to protect from harm; (7) there is no

*respondeat superior* liability in this case; (8) Plaintiff has not established deliberate indifference

to a serious medical need; and (9) qualified immunity precludes the Correctional Defendants'

liability.   ECF No. 54-2.

## I.     Medical Defendants

Plaintiff asserts a violation of the Eighth Amendment for "deliberate indifference of

medical staff to a serious medical condition."   ECF No. 1 at 3.   Construing the complaint liberally

and in the light most favorable to Plaintiff, it appears that Plaintiff faults Defendants Stafford-

Schroyer and Raynor for giving them a "fake" or "mock" medical exam after they were sprayed

with mace.   *Id.* at 6, 11.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of

its guarantee against cruel and unusual punishment.   *Gregg v. Georgia*, 428 U.S. 153, 173 (1976);

*King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).   To state an Eighth Amendment claim for

denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their

failure to act, amounted to deliberate indifference to a serious medical need.   *See Estelle v. Gamble*,

429 U.S. 97, 106 (1976).   Deliberate indifference to a serious medical need requires proof that,

objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively,

14

the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844); *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."). Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation.

*Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106).

An inmate's mere disagreement with medical providers as to the proper course of treatment also does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Farmer*, 511 U.S. at 837). But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Here, Plaintiff claims that the Medical Defendants were deliberately indifferent because they did not properly evaluate Plaintiff after they were sprayed with mace. However, as evidenced by Plaintiff's medical records, the Medical Defendants each performed a routine post-pepper spray evaluation following the incidents on July 17 and 22, 2019. Contrary to Plaintiff's assertions that the Medical Defendants only checked their pulse, the medical records reflect that both Stafford-Schroyer and Raynor also checked Plaintiff's respiration, blood pressure, and oxygen saturation. Moreover, they assessed Plaintiff physically, with Stafford-Schroyer finding that Plaintiff's sutures from the prior stab wound remained intact, and Raynor finding that Plaintiff was alert and

oriented with clear speech.  Raynor also contacted psychiatric staff for a possible follow up based on Plaintiff's statement that they may harm themselves.  Lastly, given that Plaintiff was evaluated by two other providers hours after they were seen by Raynor, during which time Plaintiff showed no signs or symptoms of distress and had no medical complaints, Plaintiff has not shown that they suffered a significant injury.

On this record, Plaintiff has not created a material factual dispute as to whether the Medical Defendants failed to make a sincere and reasonable effort to care for a medical issue.  In other words, Plaintiff has not presented facts that set forth a cognizable claim of deliberate indifference to a serious medical need.  Therefore, the Medical Defendants' motion, construed as one for summary judgment, shall be granted.[4]

## II.  Correctional Defendants

Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from citizen suits in federal court absent state consent or Congressional action.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).  The State of Maryland has not waived such immunity for claims brought pursuant to § 1983.  Accordingly, the Correctional Defendants are immune from suit for actions taken in their official capacities.

---

[4] To the extent that Plaintiff also brings medical negligence claims, the court declines to exercise supplemental jurisdiction over them.  See 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction.").  These claims are dismissed without prejudice.  *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).

With regard to claims brought by Plaintiff against the Correctional Defendants in their individual capacities, the Correctional Defendants' dispositive motion shall be granted in part and denied in part, as explained below.

### A.  DPSCS and Supervisory Defendants

As a preliminary matter, DPSCS is not a "person" subject to suit under 42 U.S.C. § 1983 and, therefore, Plaintiff's claims against it must be dismissed.  *See* 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 & n.55 (1978) (noting that for purposes of § 1983 a "person" includes individuals and "bodies politic and corporate"); *see generally* 5 Charles Alan Wright, et al., Fed. Prac. & Proc. § 1230 (2002).  A number of courts have held that inanimate objects such as buildings, facilities, and grounds do not act under color of state law and are not subject to suit under § 1983.  *See Smith v. Montgomery Cty. Corr. Facility*, Civil Action No. PWG-13-3177, 2014 WL 4094963, at *3 (D. Md. Aug. 18, 2014) (holding that Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983"); *Preval v. Reno*, 57 F.Supp.2d 307, 310 (E.D. Va. 1999) (stating that "the Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983"); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1301 (E.D. N.C. 1989) (noting that "[c]laims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit").  Conduct amenable to suit under 42 U.S.C. § 1983 must be conduct undertaken by a person, and DPSCS is not a person within the meaning of the statute.

With regard to the WCI Warden, Assistant Warden, and Chief of Security, Plaintiff does not attribute any specific action or inaction on their part that resulted in a constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (stating that liability under § 1983 attaches

only upon personal participation by a defendant in the constitutional violation).  To the extent Plaintiff intends to sue these three Defendants in their capacity as supervisors, he cannot succeed.

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983).  Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).  "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability."  *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by the WCI correctional officers and staff.  Accordingly, Plaintiff has necessarily failed to demonstrate that the three supervisors authorized or were indifferent to any violation.  Moreover, Plaintiff's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to §

1983 liability.  *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse.").  Therefore, Defendants DPSCS, the Warden, Assistant Warden, and Chief of Security shall be dismissed from suit.

### B.    Failure to Protect

The Correctional Defendants raise the affirmative defense that Plaintiff has failed properly to exhaust their administrative remedies.  If Plaintiff's claims were not properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.

The Prisoner Litigation Reform Act provides, in pertinent part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).

Although exhaustion under § 1997e(a) is not a jurisdictional prerequisite, the plaintiff must nonetheless exhaust before this court will hear the claim.  *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers

before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219.  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase*, 286 F. Supp. 2d at 530.

Because the court may not consider an unexhausted claim, *see Bock*, 549 U.S. at 220, in this very real sense, exhaustion prior to federal suit is mandatory.  *Ross v. Blake*, 578 U.S. 632, 639 (2016).  Therefore, a court ordinarily may not excuse a failure to exhaust.  *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines."  *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).  Importantly, however, the court must ensure that "any defects in exhaustion were not procured from the action or inaction of prison officials."  *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Moreover, an inmate need only exhaust "available" remedies.  42 U.S.C. § 1997e(a); *see Ross*, 578 U.S. at 637.  An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it."  *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar-Avellaveda*, 478 F. 3d at1225); *Kaba*, 458 F.3d at 684.

Inmates housed at an institution operated by DPSCS may avail themselves of the administrative grievance process which is designed for "inmate complaint resolution."  *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; COMAR 12.07.01.01B(1) (defining ARP).  If an ARP is filed and denied, the prisoner may appeal

the denial within 30 days to the Commissioner of Correction.  If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within 30 days. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B.  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.  An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).

Here, it appears that Plaintiff was aware of the administrative grievance process and the process was available to them, as Plaintiff has presented evidence that they filed ARPs regarding the incidents on July 7, 17, and 22, 2019.  Plaintiff's first ARP, regarding the failure to protect claim arising from the stabbing on July 7, was dismissed for procedural reasons.  Plaintiff was told to resubmit the ARP with the required information; however, it does not appear that Plaintiff did so.  Moreover, the IGO Director avers that no grievance was received from Plaintiff after May 19, 2019.  Because Plaintiff failed to exhaust this claim prior to filing this federal suit, their failure to protect claim brought against Defendants Bennett, Smith, Walker, McFarland, Rounds, Gordon, and Rubio is subject to dismissal.[5]

Plaintiff's remaining ARPs, alleging that the Correctional Defendants used excessive force on July 17 and 22, 2019, were also dismissed for procedural reasons.  However, as IID investigations were ongoing at that time, Plaintiff was informed that per COMAR 12.02.28.04B(5)(a), relief through the ARP process regarding the issues raised was not available.

---

[5] Even if Plaintiff had exhausted this claim, it would nonetheless fail on the merits because Plaintiff acknowledged that they had no prior dealings with their assailant and, thus, the Correctional Defendants could not have exhibited callous indifference to a *known* risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (stating that in order to succeed on a failure to protect claim, subjectively, the prisoner must establish that the prison officials exhibited deliberate or callous indifference to a specific known risk of harm); *see also Farmer*, 511 U.S. at 837.

ECF No. 1-1 at 5.  Thus, the court shall proceed to address Plaintiff's excessive force claim on the merits.

### C.      Excessive Force

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  U.S. Const, amend. VIII; *Gregg,* 428 U.S. at 173; *see Estelle*, 429 U.S. at 102; *King,* 825 F.3d at 218.  Notably, it "proscribes more than physically barbarous punishments."  *Estelle*, 429 U.S. at 103.  The Eighth Amendment "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . .'"  *Id.* (citation omitted).  Thus, it "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 989 U.S. 189, 199-200 (1989) (stating that when a state holds a person "against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *John Doe 4 v. Shenandoah Valley Juvenile Center Comm'n*, 985 F.3d 327, 338-39 (4th Cir. 2021).

The Fourth Circuit has determined that "not all Eighth Amendment violations are the same; while some constitute 'deliberate indifference' others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). Here, Plaintiff claims that the Correctional Defendants used excessive force on July 17 and 22, 2019, when they conducted an improper strip search, continuously sprayed Plaintiff with mace, verbally abused Plaintiff, and kept Plaintiff in a holding cell, either fully or partially unclothed, for an extended period.

Whether a prison official used excessive force is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to

cause harm." *Hudson*, 503 U.S. at 6-7.  The court must look at the necessity for the application of force, the relationship between that need and the amount of force applied, the extent of the injury inflicted, the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials, and any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321. The absence of significant injury, alone, is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010).  While the extent of injury incurred is one factor in determining the necessity of force in a particular situation, if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Id.* at 38.

Here, Plaintiff states under penalty of perjury that he was strip searched, physically assaulted, and verbally abused by Defendants Bennett, Hedrick, and Baumgardner on July 17, 2019.  Meanwhile, the Correctional Defendants aver that a strip search was not conducted, and Plaintiff was merely given an adjustment and transferred to a holding cell after they refused to enter their assigned cell.  Plaintiff also asserts that while they were in the holding cell, Sgt. Bennett asked them to approach before continuously spraying mace on their face and anal cavity. According to Sgt. Bennett, however, he deployed two quick bursts of pepper spray only because he noticed that Plaintiff had their head in the toilet as if they were trying to drown themselves. Plaintiff claims that Sgt. Bennett's statement about the toilet was fabricated.

Based on the parties' declarations, the Correctional Defendants have not shown that there is no dispute of material fact as to Plaintiff's excessive force claims stemming from the events of July 17, 2019.  Nor have they met their burden as to the incidents on July 22, 2019, where Plaintiff states under penalty of perjury that Defendants Welsh, Barnes, and Baumgardner emptied a can of mace and continued to spray Plaintiff until twice directed by a supervisor to stop.  Plaintiff's allegation is disputed only by COII Welsh's statement that he deployed three quick bursts of

pepper spray in an attempt to have Plaintiff remove the jumpsuit that they had tied around their neck.  Plaintiff claims, however, that they were already trying to untie the jumpsuit when COII Welsh's excessive spraying hindered their attempts.

Because a dispute of material fact exists as to incidents on these two dates, the Correctional Defendants' dispositive motion shall be denied as to Defendants Bennett, Hedrick, Baumgardner, Welsh, and Barnes.  Those five remaining Defendants will be directed to answer Plaintiff's complaint.[6]

## CONCLUSION

For the foregoing reasons, the Medical Defendants' motion, construed as one for summary judgment, will be granted, and the Correctional Defendants' motion will be granted in part and denied in part.  Plaintiff's failure to protect claim will be dismissed without prejudice for failure to exhaust administrative remedies; Plaintiff's claims against DPSCS, the Warden, Assistant Warden, and Chief of Security shall be dismissed; and the Correctional Defendants' motion will be denied as to Plaintiff's excessive force claims against Defendants Bennett, Hedrick, Baumgardner, Welsh, and Barnes.  Those remaining five Defendants will be directed to answer Plaintiff's complaint.

A separate order follows.

Date: March 20, 2023                          _____/s/_____
                                              DEBORAH K. CHASANOW
                                              United States District Judge

---

[6] In so ruling, the court does not preclude these Defendants from raising the defense of qualified immunity.  To the extent they raise that argument in their pending motion to dismiss or for summary judgment, the disputed facts noted above preclude its applicability and it is denied without prejudice.